UNITED STATES of America, Plaintiff,

v.

AMERICAN SOCIETY OF COMPOSERS, AUTHORS AND PUBLISHERS, et al., Defendants.

In the Matter of the Applications of SALEM MEDIA OF CALIFORNIA, INC., et al. and New England Continental Media, Inc., et al., Applicants.

**For Licenses for Their Radio Broadcasting Stations.**

**Civ. A. No. 13–95 (WCC).**

United States District Court, S.D. New York.

Sept. 22, 1995.*

* Opinion redacted by the court per request of applicants.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City (Allan Blumstein, Robert N. Kravitz, of counsel), White & Case, New York City (I. Fred Koenigsberg, of counsel), Bernard Korman, American Society of Composers, Authors and Publishers, New York City (Richard H. Reimer, Paula Katz, of counsel), for American Society of Composers, Authors and Publishers.

Wiley, Rein & Fielding, Washington, DC (Bruce G. Joseph, Michael L. Sturm, Richard T. Pfohl, of counsel), for Applicants.

## OPINION AND ORDER

WILLIAM C. CONNER, Senior District Judge.

This application is before the court in its capacity as the "rate court" under the Amended Consent Judgment ("Consent Decree") entered in *United States v. American Society of Composers, Authors and Publish-*

*ers,* 1940–43 Trade Cases (CCH) ¶ 56,104 (S.D.N.Y.1941), *as amended by* 1950–51 Trade Cases (CCH) ¶ 62,595 (S.D.N.Y.1950). The Consent Decree settled the United States' antitrust suit against the American Society of Composers, Authors and Publishers ("ASCAP"). This Court has retained jurisdiction under Section XVII of the Consent Decree to oversee its ongoing implementation. Section IX(A) of the Consent Decree provides that if ASCAP and a music user are unable to agree on a fee for the right to perform music in ASCAP's repertory, the music user may apply to this Court for the determination of a reasonable fee.[1]

## BACKGROUND

ASCAP is an unincorporated membership society of over 50,000 music composers, lyricists and publishers who own the copyrights to more than four million musical compositions. Each member has granted ASCAP a non-exclusive right to license the public performance rights to his or her compositions. ASCAP serves as licensing agent and as a collector and distributor of royalties. It licenses performances by a wide variety of music users, including television and radio networks and stations. ASCAP surveys tens of thousands of hours of television and radio broadcasts each year in an attempt to ensure that the public performances of its members' music are licensed, and that the royalties paid by its licensees are fairly allocated to its members in proportion to the extent of performance of their respective compositions.

The applicants in this consolidated proceeding are Salem Media of California, Inc. ("Salem Media") and New England Continental Media, Inc. ("NECM"). NECM is a group of 361 local radio stations. Of those stations, 304 broadcast religious programming, with a mixed talk and music format, while 24 broadcast classical music and most of the remaining stations carry foreign language programming. Salem Media is a group of 68 local radio stations that have similar formats. *See* Declaration of Russell Hauth, dated Feb. 15, 1995, at ¶ 4. The parties do not dispute that, compared to the majority of radio stations in the United States, the applicant stations broadcast relatively little music from the ASCAP repertory.

Salem Media's application covers the period from 1982 to 1990, while NECM's application encompasses the years 1991 to 1995. From 1986 to 1990, most local radio stations operated under the WGN license, so called because it was negotiated in settlement of the rate-setting proceeding brought by the WGN applicants. From 1991 to 1995, most local radio stations operated under the Group W license, which was negotiated in settlement of the proceeding brought by the Group W applicants. Both of these licenses were negotiated on behalf of the respective applicant groups by the Radio Music Licensing Committee ("RMLC"), which represents several thousand local radio stations. Both licenses were available in blanket or per-program form. ASCAP has offered the Salem Media stations the same license terms as those set forth in the WGN license, while the NECM stations have been offered the same terms set forth in the Group W license. The provisions of the Group W and WGN licenses relevant to this application are substantially the same, with the exception of additional administrative requirements and penalties contained in the Group W license. We will therefore refer to the terms of both licenses collectively as the "proposed license terms" and will note differences between the two only when necessary.

The NECM applicants are currently operating under an interim fee order entered on consent by this court on February 28, 1991. At that time, ASCAP and the NECM applicants agreed that the NECM applicants would pay interim fees on the same terms and at the same rates as those in effect on December 31, 1990. Effectively, the interim fee order extended the WGN license for the NECM applicants pending the outcome of this proceeding. *See* Interim Fee Order, dated Feb. 28, 1991, at ¶ 1. The Salem Media applicants are apparently still operating

---

**1.** While that proceeding is pending, the parties may agree on an interim license fee, or either party may request that the Court set an interim fee. The music user must pay the interim fee, subject to later adjustment once the final fee has been set. *See* Consent Decree, § IX(B).

under interim licenses from the 1982 period.[2] *See* Hauth Declaration, at ¶ 4.

## DISCUSSION

Applicants have brought this proceeding under Section IX(A) of the Consent Decree seeking a determination by this Court of a reasonable per-program license fee for their music use; they do not challenge the reasonableness of the blanket license ASCAP has proposed. Applicants have moved for summary judgment (i) declaring that ASCAP's proposed per-program license terms are in violation of the Consent Decree and are unreasonable as a matter of law and (ii) adopting applicants' proposed per-program license terms. In the event that we do not resolve all of the issues presented by this application at this time, the NECM applicants also seek modification of the interim fee arrangement currently in place.

Under a per-program license, a music user is granted the right to perform any of AS-CAP's compositions as many times as the user wishes, but the user pays license fees only for those programs in which it actually performs ASCAP music. *See* Consent Decree, § VII(B).[3] The per-program licenses that ASCAP and applicants have proposed share the basic fee structure common to other per-program licenses designed for radio stations. Typically, the per-program license fee rate is the sum of the fee for feature performances of ASCAP music and the fee that covers any incidental uses of ASCAP music. The feature performance fee is a percentage of the adjusted gross revenue that a radio station earns from those programs that contain feature performances of ASCAP music. The station must report to ASCAP on a monthly basis all musical compositions that received feature performances in programs broadcast by the station, unless the station concedes that a particular program contained a feature performance of AS-CAP music. The station need not report incidental uses of ASCAP music, which include commercial jingles under sixty seconds long, background music, or ambient music picked up during the broadcast of a public event. Because it would be extremely difficult for either ASCAP or the radio station to keep track of all incidental uses of ASCAP's music, the per-program license often includes an incidental use fee, which is a small percentage of the station's adjusted gross revenue.

Applicants' arguments in favor of granting summary judgment focus on three aspects of ASCAP's proposed per-program license: the proposed per-program license fee rate, the proposed definition of which programs are subject to the feature performance fee, and the proposed reporting requirements and penalties for noncompliance. For the reasons set forth below, applicants' motion for summary judgment is granted with respect to the proposed definition of which programs are subject to the feature performance fee, but is denied in all other respects. Applicants' request for modification of the interim fee order is denied.

## I. Summary Judgment Motion

Although this application is a rate-setting proceeding under the Consent Decree, applicants' motion must satisfy the traditional standards for a grant of summary judgment. We may grant summary judgment only when "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The Supreme Court has explained that "[o]nly disputes

2. It is not clear to this court why the Salem Media application period ends in 1990 if the Salem Media stations are still operating under interim licenses, but that seems to be the case.

3. By contrast, a blanket license grants the licensee the right to use any composition in ASCAP's repertory at any time and as many times as the user wishes during the term of the license. *See* Consent Decree, § VI. The Consent Decree requires ASCAP to offer only these two types of license.

Because ASCAP holds a non-exclusive right to the public performance of the music in its repertory, a music user may also negotiate with the copyright owner to obtain a "direct license" to use the music, or with the producer of a program that contains a performance of ASCAP music to obtain a "source license." *See United States v. ASCAP/Application of Capital Cities/ABC, Inc., CBS Inc. and National Broadcasting Co., Inc.,* 157 F.R.D. 173, 178 (S.D.N.Y.1994).

**416**

over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In evaluating whether a genuine question of material fact exists, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.,* at 255, 106 S.Ct. at 2513.

### A. Proposed Per–Program License Fee Rate

ASCAP has proposed that applicants pay the per-program license fee rate set forth in the Group W per-program license. Applicants argue vehemently that this proposed rate violates the Consent Decree. In so doing, they rely heavily on the decisions in *United States v. ASCAP/Application of Buffalo Broadcasting Co., Inc., et al.,* No. Civ. 13–95, 1993 WL 60687 (S.D.N.Y. Mar. 1, 1993) (Dolinger, Mag. J.) ("*Buffalo Broadcasting I*"), and *United States v. ASCAP/Application of Capital Cities/ABC, Inc., CBS Inc., and National Broadcasting Co., Inc.,* 157 F.R.D. 173 (S.D.N.Y.1994) (Conner, J.) ("*Buffalo Broadcasting II*"). A brief explanation of those decisions will therefore be helpful.

#### 1. *Buffalo Broadcasting* Proceeding

To summarize the relevant aspects of the *Buffalo Broadcasting* proceeding, ASCAP had proposed to the All–Industry Committee of Local Television Stations, which represented approximately 960 local television stations, and to twenty local television stations that were owned and operated by the three major networks a per-program license rate that was substantially higher than the proposed blanket license rate.[4] The applicants requested from this court a determination of reasonable blanket and per-program license fees. We referred the application to Magistrate Judge Dolinger. After extensive discovery and a lengthy trial, Magistrate Dolinger issued an opinion, referred to here as *Buffalo Broadcasting I,* setting blanket and per-program fees for applicants.

Magistrate Dolinger found, as a matter of fact, that ASCAP intended to make the per-program license available, as required by the Section VII(B) of the Consent Decree, but wholly impractical for all but a handful of stations that used very little ASCAP music. *Buffalo Broadcasting I,* 1993 WL 60687, at *57. Magistrate Dolinger then held, as a matter of law, that ASCAP's proposed per-program license violated the "genuine choice" provision of the Consent Decree.[5] He interpreted the genuine choice provision to require that the per-program license fee "be set in such a way that, when compared to the blanket license fee, its use is economically feasible for a significant segment of the industry...." *Id.,* at *66. He then noted that several additional considerations must be considered in devising a fee formula, including the need to guarantee a fair return to ASCAP, to avoid market inefficiency caused by too many stations operating under administratively burdensome per-program licenses, and to avoid giving stations incentives not to use ASCAP music. *See id.* After stating that "[t]hese considerations yield no precise formula," *Id.,* Magistrate Dolinger found that the per-program license fee for applicants would be reasonable if the per-program license fee rate were set so that the typical local television station would pay approximately the same fee under the per-program license as under the blanket license, exclusive of administrative costs. *Id.,* at *67.

Those applicants for which Magistrate Dolinger's opinion took the form of a report and recommendation filed objections to his deci-

---

**4.** For instance, under ASCAP's proposal, if all of a station's programming contained ASCAP music that was not otherwise licensed, the station's per-program license fee would be four times as much as its blanket license fee, while if 75% of a station's programming contained otherwise unlicensed ASCAP music, the per-program license fee would be three times as much as the blanket license fee.

**5.** Section VIII of the Consent Decree provides that:

Defendant ASCAP, in fixing its fees for the licensing of compositions in the ASCAP repertory, is hereby ordered to use its best efforts to avoid any discrimination among respective fees fixed for the various types of licenses which would deprive the licensees or prospective licensees of a genuine choice from among such various types of licenses.

sion with us.[6] In *Buffalo Broadcasting II*, we explicitly found that with respect to the meaning of the genuine choice provision, Magistrate Dolinger's legal conclusions withstood *de novo* review and his factual findings were not clearly erroneous. *See Buffalo Broadcasting II*, 157 F.R.D. at 200–03.

### 2. Genuine Choice Arguments

#### a. Total Per–Program License Fee

■ In the instant proceeding, ASCAP has proposed a blanket license fee of approximately 1.6% of a local radio station's adjusted gross revenue.[7] The per-program license fee ASCAP has proposed for the same period is 4.22% of the station's revenue subject to fee,[8] plus an incidental use fee of .24% of adjusted gross revenue.[9] *See* Group W Per–Program License, at ¶ 4A, attached as Exhibit A to Pfohl Declaration. Therefore, for any station that uses ASCAP music in more than one-third of its program hours, the per-program

license fee would be higher than the blanket license fee.[10]

Applicants assert that it is beyond dispute that a typical local radio station in the industry uses ASCAP music in far more than 30% of its programming.[11] *See* Applicants' Memorandum, at 21. Relying on the methodology developed in *Buffalo Broadcasting I*, applicants argue that because the per-program license fee proposed by ASCAP in this case is not equivalent to the blanket license fee for the typical local radio station in the industry, ASCAP's proposal violates the genuine choice provision of the Consent Decree. Applicants stress that questions regarding the interpretation of the Consent Decree are matters of law and assert that no reason exists to distinguish this application from the *Buffalo Broadcasting* application. Hence, they contend that we are bound to use the *Buffalo Broadcasting* methodology to set the per-program license fee rate for applicants.[12]

---

**6.** Most of the stations consented to the referral of their applications for trial under 28 U.S.C. § 636(c). Those twenty local stations that were owned and operated by the networks did not. As to those stations, Magistrate Dolinger's opinion was a report and recommendation only.

**7.** Under the Group W license, the blanket license fee rate rises annually from 1.575% of adjusted gross revenue in 1991 to 1.615% of adjusted gross revenue in 1995. *See* Group W Blanket License, at ¶ 5A, attached as Exhibit A to Declaration of Richard T. Pfohl, dated Feb. 16, 1995. Under the WGN license, the blanket license fee rate is 1.725% of adjusted gross revenue. *See* WGN Blanket License, at ¶ 5, attached as Exhibit B to Pfohl Declaration. The two licenses define adjusted gross revenue somewhat differently, but those distinctions are not relevant to our discussion here. *See* Group W Blanket License, at ¶ 2H; WGN Blanket License, at ¶ 2G.

**8.** "Revenue subject to fee" is the percentage of a station's adjusted gross revenue attributable to programs that contain feature performances of ASCAP music. Because it is virtually impossible to attribute revenue to specific programs, the per-program license contains a formula that approximates attributable revenue by using a weighted average of the number of program hours that contain feature performances of ASCAP music.

**9.** Under the WGN per-program license, the incidental use fee is calculated differently but yields approximately the same fee amount. *See* Applicants' Memorandum, at 24 n. 22 (citing deposition testimony of ASCAP's Chief Economist).

**10.** Assume a local radio station reports ASCAP music use in 33% of its weighted hour programs. Revenue subject to fee is therefore .33 × AGR (adjusted gross revenue). At ASCAP's proposed per-program license fee rate, the total per-program fee would be (.0422) (.33) (AGR) + (.0024) (AGR) = (.016326) (AGR), or 1.633% of adjusted gross revenue. Compare this to the blanket license fee rate of 1.6% of adjusted gross revenue.

**11.** Applicants' expert has stated that an examination of a 1990 published directory of radio stations nationwide reveals that 82% of radio stations have an all-music format. *See* Hauth Declaration, at ¶ 8. ASCAP's Chief Economist has estimated that programming on all-music commercial stations contains feature performances of ASCAP music per hour. *See* Deposition Transcript of Dr. Boyle, dated Feb. 3, 1994, at 22–23, attached as Exhibit L to Pfohl Declaration.

**12.** Applicants also argue that ASCAP has conceded that radio and television stations should be treated alike for purposes of evaluating whether proposed licenses satisfy the genuine choice provision. Applicants cite the deposition testimony of ASCAP's Chief Economist, who stated in answer to a question from applicants' counsel that, in ASCAP's view, the relationship between blanket and per-program license fees should be similar in radio and television. *See* Deposition Transcript of Dr. Boyle, at 39–40. *But see* Affidavit of Peter M. Boyle, dated April 10, 1995, at ¶ 20 (offering conflicting interpretation of his deposition testimony).

Even if applicants' explanation of Dr. Boyle's testimony is correct, however, it is our under-

While we agree, of course, that questions of Consent Decree interpretation are generally issues of law, *see Berger v. Heckler,* 771 F.2d 1556, 1568 (2d Cir.1985), we do not share applicants' confidence that the equivalence formula devised by Magistrate Dolinger in *Buffalo Broadcasting I* and subsequently approved by this Court for use in that proceeding, also applies, as a matter of law, to this proceeding. Applicants overstate their case when they contend that Magistrate Dolinger, and this court, held that the genuine choice provision requires the per-program and blanket license fees to be equivalent for the typical music user in the relevant industry. All that *Buffalo Broadcasting* held was that, in the context of an industry-wide application by the local television stations, the genuine choice provision is satisfied if the per-program license is an economically viable alternative for a significant number of those stations. That holding says nothing about the methodology by which the court should determine a reasonable license fee. Indeed, both *Buffalo Broadcasting* opinions explicitly recognize that the genuine choice provision of the Consent Decree does not mandate a specific relationship between the blanket and per-program license fees. *See Buffalo Broadcasting II,* 157 F.R.D. at 202; *Buffalo Broadcasting I,* 1993 WL 60687, at *58, *66.

The equivalence formula devised by Magistrate Dolinger was developed to implement his interpretation of the genuine choice provision under the circumstances presented in the *Buffalo Broadcasting* application. Accordingly, it was designed to create a fee structure that was reasonable when applied across the entire local television industry. On that basis, we endorsed Magistrate Dolinger's formula. The circumstances presented in this proceeding, however, differ markedly from the situation in *Buffalo Broadcasting.* This application has been brought by a small fraction of the local radio stations, who

are before this court precisely because the amount of ASCAP music they use is not typical of music use in the industry as a whole.

The goal of any fee-setting proceeding is to arrive at a reasonable fee for the applicants before the court. Because the factual circumstances surrounding each application differ, we are reluctant to adopt any particular methodology as a golden rule that applies to all rate-setting proceedings. While we find the equivalence formula intuitively appealing, the possible pitfalls of holding that the genuine choice provision may only be satisfied by that particular fee-setting methodology are readily apparent in this case. Without reliable information regarding the amount of ASCAP music used by the typical local radio station in the industry,[13] we would have no basis for evaluating the reasonableness of any per-program license fee we might set for these applicants under the equivalence formula. In order to develop that information, ASCAP and applicants, a relatively small group of atypical music users, would have to gather and present evidence on the amount of ASCAP music used by all local radio stations in the United States. It may be that applicants will convince us at trial that this approach is the only way to set a reasonable per-program license fee for their music use. We are hopeful, however, that we can set a reasonable fee for the 429 applicant stations without making extensive findings of fact concerning the music use of the approximately 9100 other local radio stations in the United States.

We therefore decline, at this stage in this proceeding, to use the equivalence formula devised by Magistrate Dolinger in *Buffalo Broadcasting* to set the per-program license fee rate available to applicants. Instead, we will await the development of the record at

standing of the genuine choice provision, and not Dr. Boyle's or ASCAP's, that is relevant here.

**13.** Applicants' expert has estimated that at least 95% of the programming on a radio station with an all-music format contains feature performances of ASCAP music. *See* Hauth Declaration, ¶ 9. Because upwards of 80% of radio stations nationwide have all-music formats, *see* Hauth Declaration, at ¶ 8, applicants assert that

90% of the programming on a typical local radio station must contain feature performances of ASCAP music. *See* Applicants' Memorandum, at 29.

While the percentage of program hours broadcast by most local radio stations that contain ASCAP music is certainly substantial, applicants' figure seems to be little more than a guess.

trial before determining what per-program license fee structure will satisfy the genuine choice provision and result in a reasonable fee for applicants.

### b. Incidental Use Fee

■ Over and above their objections to the total per-program license fee rate, applicants advance an additional argument in support of their position that the proposed incidental use fee rate violates the genuine choice provision of the Consent Decree. Applicants base their arguments, once again, on *Buffalo Broadcasting I.* In that opinion, Magistrate Dolinger set an incidental use fee of 7.5% of the maximum possible per-program license fee, which corresponded to the percentage of ASCAP's total revenues that ASCAP allocates to its members as compensation for incidental uses. *See Buffalo Broadcasting I,* 1993 WL 60687, at *77. Applicants contend that ASCAP's proposed incidental use fee is ▆▆▆ times as high as the proportion of its royalties from radio performances that are derived from incidental uses. They argue that because the incidental use fee is a crucial aspect of a workable per-program license, ASCAP has deprived them of a genuine choice between the per-program and blanket licenses by setting the incidental use fee at such a high rate. Applicants therefore urge us to grant summary judgment declaring that ASCAP's proposed incidental use fee violates the Consent Decree and adopting instead applicants' proposed version.

Applicants conveniently ignore that in *Buffalo Broadcasting II,* we vacated the incidental use fee portion of the per-program license fee set by Magistrate Dolinger. In so doing, we held that the incidental use fee is neither a per-program nor a blanket license. Because the Consent Decree only requires ASCAP to offer those two types of license, *see* Consent Decree, §§ VI, VII(B), we are without authority to order ASCAP to offer a license that includes an incidental use fee. *See Buffalo Broadcasting II,* 157 F.R.D. at 204–05. Of course, our ruling does not prevent ASCAP and music users from agreeing to a mutually acceptable incidental use fee; the parties are free to agree to any terms they wish, regardless of the Consent Decree.

*See id.,* at 204 n. 33. We simply may not dictate the terms of an incidental use fee.

Applicants attempt to distinguish *Buffalo Broadcasting II* by arguing that ASCAP opposed the incidental use fee that Magistrate Dolinger designed, while in this case both parties have agreed to the inclusion of an incidental use fee in the proposed per-program license. According to applicants, they simply disagree on the amount of that fee. ASCAP contests this explanation of its position and asserts that it agreed to an incidental use fee only as part of the entire package of provisions in the Group W per-program license. If applicants are not willing to accept all of the Group W per-program license terms, ASCAP states that it is not willing to agree to an incidental license fee. Be that as it may, if we have no power to order an incidental use fee, it follows that we have no power to referee a dispute between the parties over what that fee should be.

We agree with applicants that an incidental use fee is an eminently sensible alternative to attempting to monitor the incidental use of ASCAP music. Nevertheless, whether such a fee will be put in place between ASCAP and applicants, and what rate will be charged, are entirely up to ASCAP and applicants. We would exceed the power granted to us by the Consent Decree if we stepped in.

Applicants' motion for summary judgment declaring that ASCAP's proposed per-program license fee violates the Consent Decree is denied.

### 3. Reasonableness Arguments

■ In addition to arguing that ASCAP's proposed per-program license fee rate violates the genuine choice provision of the Consent Decree, applicants contend that the justifications ASCAP has advanced to support its proposed per-program license fee rate are "insufficient as a matter of law." *See* Applicants' Memorandum, at 25. Applicants seem to be arguing that they are entitled to summary judgment declaring that ASCAP's proposed per-program license fee rate is unreasonable. As applicants correctly point out, the Consent Decree places the burden on ASCAP to prove the reasonableness of a

**420**

proposed fee. *See* Consent Decree, § IX(A). It is well-settled that "Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). To defeat summary judgment, the nonmoving party must "designate 'specific facts showing that there is a genuine issue for trial.'" *Id.*, at 324, 106 S.Ct. at 2553 (quoting Rule 56(e)).

■■■ ASCAP points out that approximately ■■■ local radio stations currently operate under Group W per-program licenses, which charge the same per-program license fee rate ASCAP has proposed to applicants. ASCAP further asserts, correctly, that under this court's holding in *United States v. ASCAP/Application of Capital Cities/ABC, Inc., and CBS, Inc.*, 831 F.Supp. 137, 144 (S.D.N.Y.1993), the starting point in our evaluation of the reasonableness of any fee proposal is an examination of prior negotiated agreements between the parties or those similarly situated. ASCAP states that under prior negotiated radio licensing agreements, the ratio of per-program to blanket license fee rates was 3:1 or higher, while the fee ratio for the licenses ASCAP has proposed to applicants is slightly less than 3:1. ASCAP argues that either of these factual circumstances could support a finding that its proposed per-program license fee rate is reasonable. Applicants seek to persuade us otherwise.

Applicants argue first that the negotiating history of the Group W license demonstrates that ASCAP may not rely on the number of local radio stations currently operating under the Group W per-program license as evidence that the proposed per-program fee rate is reasonable for applicants. Applicants contend that the RMLC, which negotiated the Group W license, is dominated by stations with music intensive programming that are not interested in the per-program license. Applicants, fearing that the RMLC would not adequately represent their interests, requested and were refused permission to partici-

pate in the negotiations between ASCAP and the RMLC. Applicants cite correspondence among ASCAP, the RMLC and applicants, as well as notes from Group W negotiating sessions, that seem to indicate that ASCAP and the RMLC were aware that applicants' interests diverged from those of the stations represented by the RMLC. *See* Applicants' Memorandum, at 6–9. Applicants argue that under these circumstances, it is clear that the RMLC did not negotiate vigorously enough to obtain a per-program license fee rate that would provide applicants with a genuine choice between the blanket and per-program licenses.

ASCAP counters that applicants' exclusion from the Group W negotiations simply means that the Group W per-program license is not binding on applicants, but has no bearing on whether the fact that other local radio stations have accepted the Group W per-program license is reliable evidence of the reasonableness of that per-program license fee rate for applicants. ASCAP also contends that the RMLC represents a broad spectrum of local radio stations, including numerous stations with formats other than all-music programming. *See* Hochman Affidavit, at ¶¶ 5, 8–13. According to ASCAP, there is no reason to conclude that the RMLC negotiated an unreasonable per-program license fee rate.

These contentions demonstrate that a question of fact exists regarding whether applicants are sufficiently similarly situated to the stations presently operating under Group W per-program licenses for the Group W per-program license fee rate to be reliable evidence of the reasonableness of the proposed per-program license terms for applicants. We are somewhat skeptical that the Group W per-program license will prove to be a reliable benchmark, especially since agreements negotiated by ASCAP and third parties are less persuasive of reasonableness than prior negotiated agreements between ASCAP and applicants. *See ABC/CBS*, 831 F.Supp. at 155. Nevertheless, ASCAP's assertions have sufficient plausibility and factual support to withstand summary judgment.

■■■ Turning to ASCAP's contentions concerning the fee ratios established by prior

agreements, applicants point out that in *Buffalo Broadcasting I,* Magistrate Dolinger found that the prior negotiated licensing agreements in the radio industry, which embodied per-program to blanket license fee ratios of 3:1 or 4:1, were not reliable benchmarks for evaluating the reasonableness of proposed per-program license rates for the local television station applicants. *See Buffalo Broadcasting I,* 1993 WL 60687, at *59. He reasoned, *inter alia,* that the radio license negotiators had not bargained vigorously for favorable per-program license rates and that the prior radio license agreements reflected ASCAP's greater bargaining leverage. *See id.,* at *61; *Buffalo Broadcasting II,* 157 F.R.D. at 199. We found that he had not committed legal error in reaching this conclusion, nor were any of the underlying factual findings he made on this issue clearly erroneous. *See Buffalo Broadcasting II,* 157 F.R.D. at 198–200. According to applicants, ASCAP is therefore collaterally estopped from relying on those agreements to demonstrate the reasonableness of its proposed per-program license terms in this proceeding.

■ In the Second Circuit, the party seeking the application of collateral estoppel to preclude relitigation of an issue must show, *inter alia,* that the issues in both proceedings are identical. *See Gelb v. Royal Globe Ins. Co.,* 798 F.2d 38, 44 (2d Cir.1986), *cert. denied,* 480 U.S. 948, 107 S.Ct. 1608, 94 L.Ed.2d 794 (1987). ASCAP contends that the issue considered by Magistrate Dolinger in *Buffalo Broadcasting* and the issue presented in this application do not satisfy this requirement. We agree. Although Magistrate Dolinger's findings were rather sweepingly phrased, the issue he considered was only the reliability of prior radio licensing agreements as benchmarks for determining the reasonableness of the per-program license offered to the local television industry. It is by no means clear that the *Buffalo Broadcasting* applicants are situated so similarly to the Salem Media and NECM applicants that we may assume that prior negotiated radio licensing agreements are also unreliable benchmarks for evaluating the reasonableness of the proposed per-program license for this relatively small number of local radio stations. Accordingly, applicants have not persuaded us that ASCAP is collaterally estopped from arguing that the prior radio per-program license agreements are evidence of the reasonableness of its current proposal.

Whatever the ultimate persuasiveness of ASCAP's arguments on this point may be, we must consider ASCAP's contentions carefully, as well as "faithfully address both challenges to the validity of negotiated agreements as reliable benchmarks of reasonable rates at the time entered [and] changed circumstances that may make prior benchmarks outdated measures of fair value." *ABC/CBS,* 831 F.Supp. at 145. At this point, given that on a motion for summary judgment we must draw all justifiable inferences in favor of the nonmoving party, we find that ASCAP has presented facts that could permit us to resolve this inquiry in its favor. Summary judgment declaring ASCAP's proposed per-program fee rate unreasonable is therefore not appropriate.

### 4. Applicants' Proposed Per–Program License Fee Rate

Because we have denied applicants' motion for summary judgment declaring ASCAP's proposed per-program license fee rate to be in violation of the Consent Decree and unreasonable as a matter of law, we need not consider in detail applicants' motion that we adopt their own proposed fee structure. Applicants' summary judgment motion seeking adoption of their proposed per-program license fee rate is denied.

### B. Proposed Definition of Programs Subject to Fee

Under the Group W license, the feature performance fee is calculated as a percentage of the "revenue subject to fee." *See* Group W Per–Program License, at ¶ 4A(2). "Revenue subject to fee" is the revenue attributable, via a weighted hours formula, to "programs subject to fee." *See id.,* at ¶ 2M. "Program subject to fee" is defined as

> "any local radio program which uses any of the compositions in [ASCAP's] repertory, except: (1) any program making only 'incidental use' ... of such compositions ...; and (2) any program presented by transcription if payment to [ASCAP] (as distin-

guished from its members) for the right to perform publicly has been made at the source with respect to musical compositions embodied in such transcription program."

*Id.,* at ¶ 2C. As applicants point out, licensees under the Group W per-program license are therefore required to pay per-program fees on programs that contain a feature performance of ASCAP music regardless of whether the performance in question is a fair use or is licensed by someone other than ASCAP. ASCAP has proposed these same license terms to applicants.

■ In *Buffalo Broadcasting II,* we held that ASCAP has no right to demand royalty payments for music uses that are exempt from copyright liability, including fair uses. We explained that "[t]he purpose of the licenses ASCAP offers is to grant the licensee the right to use music in its repertory, for a price, without incurring copyright liability." *Buffalo Broadcasting II,* 157 F.R.D. at 207. If there is no exposure to copyright liability, there is no need for a license and ASCAP may not insist on terms that include one. *See id.* Therefore, ASCAP may not include programs that contain performances of ASCAP music that are not subject to copyright liability in the definition of "programs subject to fee."

■ ASCAP is also not entitled to collect royalties for uses of ASCAP music that would be subject to copyright liability except that the music user has obtained a license from another source. The Consent Decree restricts the scope of ASCAP's activities by permitting it only a non-exclusive right to grant licenses under the members' copyrights. *See* Consent Decree, § IV(A). The music user may therefore approach an ASCAP member directly or may obtain the desired public performance license from the producer of a program, if that person has been granted the right to license public performances of the piece. The availability of source or direct licensing has been recognized as a counterweight to ASCAP's bargaining power. *See United States v. AS-CAP/Application of Turner Broadcasting System, Inc.,* 782 F.Supp. 778, 790, 813 (S.D.N.Y.1991) (Dolinger, Mag.J.), *aff'd,* 956

F.2d 21 (2d Cir.), *cert. denied,* 504 U.S. 914, 112 S.Ct. 1950, 118 L.Ed.2d 554 (1992). If, as under the terms ASCAP has proposed to applicants, the music user must pay ASCAP for the performance of its music regardless of whether the music user has already paid a license fee elsewhere, the music user has no incentive to pursue source or direct licensing. This result is contrary to the pro-competitive purpose of the Consent Decree.

We therefore grant applicants summary judgment declaring that the definition of "program subject to fee" in ASCAP's proposed per-program license violates the Consent Decree to the extent that it includes programs that contain feature performances of ASCAP music that are not subject to copyright liability or that have been licensed by other means.

ASCAP argues that by granting applicants' motion in this respect we have substantially increased the administrative burdens imposed upon it. This contention is plausible: for instance, ASCAP will be required to monitor, at least to some extent, whether ASCAP music that the local radio stations claim is licensed directly or at the source is indeed so-licensed and whether music uses that the stations claim are fair uses are indeed fair uses. ASCAP contends that it is entitled to an administrative fee to defray these costs. In another context, we indicated in *dicta* that ASCAP was entitled to an incremental increase in the per-program license fee rate in order to reimburse it for the expenses it incurred in administering the per-program license. *See Buffalo Broadcasting II,* 157 F.R.D. at 203 n. 29 (expressing our approval of administrative fee set by Magistrate Dolinger although neither party had objected to its imposition). We are inclined to think that ASCAP's request is reasonable, if indeed it would incur additional monitoring costs. Based on the record before us, however, we cannot begin to judge the extent of those additional costs, if any, or to determine what a reasonable administrative fee would be. Therefore, the final determination of whether ASCAP is entitled to an administrative fee, as well as how much that fee should be, must await trial.

### C. Proposed Administrative Penalties

 Applicants also seek summary judgment declaring that a number of the administrative provisions—including certain reporting requirements and penalties for errors or omissions—in ASCAP's proposed per-program license are unreasonable as a matter of law. Applicants argue that these provisions are unnecessary to ensure the provision of what ASCAP itself considers adequate information about the stations' music use. Applicants therefore contend that the only rationale behind the administrative requirements and penalties is to render the per-program license less attractive to music users.

We agree with applicants that ASCAP may only impose those reporting requirements and penalties that are reasonably necessary to ensure that ASCAP receives adequate and accurate music use information from per-program licensees. We also agree with AS-CAP, however, when it argues that questions of fact exist regarding what sort of reporting requirements and penalties for noncompliance would be reasonable. At this stage in the proceedings, any decision we might make on this issue would be based on sheer speculation. Indeed, it would be premature to attempt to evaluate the reasonableness of provisions designed to implement the per-program license before the key terms of that license have been set. Accordingly, we deny applicants' motion for summary judgment declaring the proposed administrative provisions unreasonable.

### II. Request for Modification of Interim Per–Program License

 On February 28, 1991, this court entered an order on consent that established interim fees for the NECM stations. Under that agreement, the NECM stations were permitted to decide whether they wished to pay interim fees according to the terms of the WGN per-program license or the WGN blanket license. *See* Interim Fee Order, at ¶¶ 1, 4. Applicants ask this court to modify the terms of the interim per-program license only. Essentially, applicants argue that under the principles enunciated in *Buffalo Broadcasting I* and *II*, whatever final per-program license fee rate we set in this proceeding will be substantially less than the interim per-program license fee currently in effect. Applicants contend that adjusting the amount paid after we set a final per-program license fee would not be an adequate remedy because ASCAP will have enjoyed the use of substantial sums of applicants' money during the pendency of this proceeding. Applicants therefore seek the imposition of an interim per-program license that conforms to applicants' suggested per-program license terms, which they argue are closer to the probable final per-program license fee rate.

As Magistrate Dolinger previously noted in another fee-setting proceeding, "it is ordinarily appropriate to make only one interim fee determination.... Subsequently developed information that is pertinent to the setting of a reasonable license fee will be considered at the Article IX(A) stage." Memorandum and Order, dated Apr. 29, 1986, at 6, *entered in United States v. AS-CAP/Application of Showtime/The Movie Channel*, No. Civ. 13–95 (S.D.N.Y.). This guideline admirably serves the purposes of judicial economy by preventing parties from revisiting the issue of the interim fee at every step of discovery or from litigating the issue of the final fee in stages.

Applicants attempt to distinguish their request from the application considered by Magistrate Dolinger by pointing out that the interim fee set in the *Showtime* proceeding was fixed by the court, while in this case the parties agreed on the interim fee. We see no reason, however, why a different result should obtain on that basis. If anything, we are less inclined to consider modifying an interim fee arrangement that the parties negotiated themselves.[14]

Applicants argue that they agreed to the interim fee arrangement before the decisions

---

**14.** Applicants also contend that the *Showtime* decision is inapplicable here because the interim fee agreement specifically provides that either party may apply to this court for a modification. *See* Interim Fee Order, at ¶ 8. The agreement merely says, however, that the parties may *apply* for a modification. It says nothing at all about the circumstances under which we should grant modification.

in *Buffalo Broadcasting* were issued. They contend that under the rationale of those decisions, it is obvious that the interim fee to which they agreed is substantially higher than any final fee this court might set. As we explained at length above, however, the methodology developed in *Buffalo Broadcasting* does not necessarily apply to the instant application. Hence, it is not clear to us that applicants' interim fees have been so grossly excessive as to justify our intervention. Therefore, we deny applicants' motion to modify the interim fee arrangement to which they previously agreed.

## CONCLUSION

For the reasons set forth above, applicants' motion for summary judgment is denied in all respects, except that we grant summary judgment declaring that portions of ASCAP's proposed definition of "programs subject to fee" violate the Consent Decree. Furthermore, we deny applicants' motion to modify the interim fee agreement set forth in the Order of February 28, 1991.